**POSNER LAW CORPORATION**
ASHLEY D. POSNER (Cal. Bar No. 106195)
15303 Ventura Boulevard, Suite 900
Sherman Oaks, CA 91403
Telephone: (310) 475-8520
ashleyposner@gmail.com

**NAGEL RICE, LLP**
Jay J. Rice, Esq.
103 Eisenhower Parkway
Roseland, New Jersey 07068
973-618-0400
jrice@nagelrice.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWARD LINDZON, SOCIAL LEVERAGE, LLC, SOCIAL LEVERAGE CAPITAL FUND I, LP and SOCIAL LEVERAGE CAPITAL FUND II, LP,<br><br>Plaintiffs,<br><br>vs.<br><br>DANIEL NADLER, and KENSHO TECHNOLOGIES, INC.<br><br>Defendants. | Case No.: 3:15-cv-00828<br><br>**PLAINTIFFS' COUNTERSTATEMENT OF MATERIAL FACATS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date: October 30, 2015<br>Time: 1:30 p.m.<br>Location: Courtroom 13A<br>Judge. Hon. Dana M. Sabraw |

I. **PLAINTIFFS COUNTER-STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFEDNANT'S MOTION AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

A. **Defendants Daniel Nadler and Kensho Techonologies, Inc.**

1. Admitted.

2. Admitted, except PLaintiffs cannot admit or deny whether "Kensho's engine is capable of answering questions like, "What happens to the share prices of energy companies when oil trades above $100 a barrel and political unrest has recently occurred in the Middle East?"

3. Admitted.

4. Admitted.

5. Denied in part. Social Leverage was responsible for introducing Kensho to Goldman Sachs because Social Leverage, at the 2013 Lindzonpalooza, introduced Nadler to Heidi Johnson from "Markit" who in turn introduced Nadler to Goldman Sachs.  (See Lindzon Cert., at ¶ 12b).

B. **Plaintiffs Howard Lindzon, Social Leverage LLC, Social Leverage Capital Fund I LP, and Social Leverage Capital Fund II LP.**

6. Admitted.
7. Admitted.
8. Admitted.
9. Admitted.
10. Admitted.
11. Admitted.
12. Admitted.
13. Admitted.
14. Admitted.
15. Admitted.
16. Admitted.

17. Admitted.

18. Admitted.

19. Admitted.

20. Admitted.

21. Admitted.

**C.   The Parties' Relationship**

22. Denied. When Lindzon and Nadler first met, Nadler was seeking funding for Kensho and neither Lindznor nor Social Leverage reacted negatively to Nadler's pitch of Kensho.

23. Admitted.

24. Denied in Part. Nadler was invited to and did participate in the 2013 Lindzonpalooza. (See Lindzon Cert., at ¶ 12b). Moreover, Lindzon and Nadler had no discussions concerning the cost or expense of attending Lindzonpalooza.

25. Denied.

26. Denied. While it is true that time did not permit Mr. Nadler to present (and note that Kensho was not the only startup that unfortunately was unable to present that day, there were several others), we made sure that Mr. Nadler had direct contact with a number of attendees throughout the weekend. By way of example, we introduced him to Heidi Johnson from "Markit" who in turn introduced Mr. Nadler to Goldman Sachs. (See Lindzon Cert., at ¶ 12b). Follow Lindzonpalooza, Nadler repeatedly expressed his thanks for his inclusion in the event and the number and quality of introductions Social Leverage provided to Kensho. (Lindzon Cert., ¶¶ 12c, 12d).

27. Denied. Social Leverage Capital Fund I, L.P. did not make a "loan" to Kensho; rather, it entered into a convertible debenture, that would convert into an equity stake in Kensho at Social Leverage's option.

28. Denied. The relationship between Kensho and Social Leverage soured because after Social Leverage helped Kensho obtain significant additional

financing, Nadler ceased responding to us, or advising us as to any aspect of Kensho. Moreover, Kensho purportedly cancelled Social Leverage's convertible note and refused to permit Social Leverage to convert its interest into Kensho equity, contrary to numerous representations and promises made by Nadler to Social Leverage.

29. Admitted.

30. Denied in part. Kensho improperly paid Social Leverage's convertible note and did so in violation of numerous representations and promises made by Kensho concerning Social Leverage's rights and opportunities to participate as an equity investor in Kensho.

31. Admitted.

32. Denied. Lindzon has not disparaged Nadler nor questioned his ethics.

**D.    The Emails At Issue**

33. Admitted.

34. Cannot admit or deny as plaintiffs have no knowledge as to whether Mr. Fed "previously g[ave] Mr. Nadler advice."

35. Denied.

36. Admitted.

37. Denied in part. Plaintiffs contest whether Nadler's February 27, 2015 email to Messrs. Destin and Bohn responded to any inquiry.

38. Admitted.

**E.    Lindzon & Associates LLC**

39. Admitted.

40. Admitted.

**F.    Empire Capital Group**

41. Denied in part. Lindzon served as Executive Vice President of Empire Capital Group and was a shareholder.

42. Admitted.

43. Admitted.

44. Admitted.

45. Admitted.

### G. Disputes and Litigation With Others

#### 1. Charl.ly & Sykes

46. Admitted.

47. Admitted but aver that all claims against Stocktwits were dismissed.

48. Admitted.

49. Admitted.

50. Admitted.

51. Admitted.

52. Admitted.

#### 2. Digital Whammy

53. Admitted but aver that all claims against Longtail were dismissed.

#### 3. Sport Squeeze

54. Admitted but aver that in a final consent judgment, the court, among other adverse rulings, enjoined Sport Squeeze from further infringement of Pro-Innovative's patents.

## II. ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFEDNANT'S MOTION AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

### A. Howard Lindzon

55. Lindzon has more than twenty (20) years of experience in the financial community in both as an entrepreneurial and investor. Lindzon received a Bachelor of Commerce degree from the University of Western Ontario in 1987; a Masters of Business Administration from Arizona State University in 1990; and a Masters in International Management from the Thunderbird School of Global Management in 1991. (Lindzon Cert., ¶ 2).

56. Lindzon first entered the world of venture capital in 1994, and has remained involved in venture capital for the past 21 years. (Lindzon Cert., ¶ 3).

57. Among other things, Lindzon has accomplished the following: (i) formed a hedge fund in 1998; (ii) formed an investment firm, Lindzon & Associates, LLC; (iii) was a shareholder in a securities broker-dealer group, Empire Capital Group; (iv) was a principal and limited partner in Knight's Bridge Capital Partners; (v) created a daily business satire internet show called "Wallstrip" in 2006, which was later acquired by CBS Interactive in 2007; and (vi) created "Stocktwits" in 2009, which is a social community primarily geared for individuals and entities active in the public equity markets. (Lindzon Cert., ¶ 4).

58. In addition, Lindzon has spent much of careers fostering and mentoring entrepreneurs and start-ups as part of the "Techstars" program. (Lindzon Cert., ¶ 5).

**B.    Social Leverage**

59. In 2009, Lindzon and Tom Peterson started Social Leverage LLC ("SL"), which is a venture capital firm focused on early-stage opportunities primarily in tech, media, and so-called "fintech" startups. (Lindzon Cert., ¶ 6).

60. SL is typically among the first professional investors to invest in a business's early development. (Lindzon Cert., ¶ 6).

61. As an early stage venture capital fund, SL is a high risk, high reward venture. (Lindzon Cert., ¶ 6).

62. SL has a portfolio of over 100 active companies. (Lindzon Cert., ¶ 6).

63. Some of SL's previous investment include "Golf Now" (which is now owned by Comcast) and "Assistly", "Go Instant" and "Buddy Media" which have been acquired by "Salesforce." (Lindzon Cert., ¶ 6).

64. In addition, SL invested in "Rent.com" which was later acquired by E-Bay and "Summarize", LuckySort" and "Tweetcheck" which have now been

acquired by "Twitter". (Lindzon Cert., ¶ 6). SL's most recent fund, Fund II, has raised over $20 Million from a host of inventors.

65.  In addition to its investing activities, SL also hosts a "Lindzonpalooza" weekend conference where SL brings together investors, entrepreneurs and other players active in the so-called early-stage ecosystem to meet and share and swap ideas and contacts in an informal setting. (Lindzon Cert., ¶ 6).

### C. Social Leverage Invests In Kensho

66.  SL was the first professional investor to see potential in Kensho; and, subsequently, was the first company to invest in Kensho. (Lindzon Cert., ¶ 12a). Following's SL's initial investment, Nadler thanked Lindzon for SL's leading role in getting Kensho off the ground. (Lindzon Cert., ¶ 12a; Ex. A).

67.  Nadler also took advantage of SL's connections to bolster Kensho's reputation as an emerging tech company. (Lindzon Cert., ¶ 12b).

68.  SL made numerous introductions for Kensho to potential advisors and invited Nadler to participate in the 2013 Lindzonpalooza. (Lindzon Cert., ¶ 12b). While Nadler was unable to present at Lindzonpalooza due to time constraints, Lindzon did ensure that Nadler was introduced to a number of attendees, including Heidi Johnson from "Markit" who in turn introduced Mr. Nadler to Goldman Sachs. (Lindzon Cert., ¶ 12b).

69.  Nadler appreciated SL's efforts as on April 15, 2013, Nadler wrote Lindzon and stated "once again, great meeting with you over the weekend and thank you for the wonderful hospitality in inviting me down there. It was a great learning experience." (Lindzon Cert., ¶ 12b).

70.  Nadler reaffirmed his feelings in a [TO COME] email. (Lindzon Cert., ¶ 12c).

### D. General Catalyst Invests In Kensho

71.  On June 9, 2013, a few months after SL's initial investment in Kensho and Nadler's attendance at Lindzonpalooza, Nadler wrote Lindzon to confirm

Kensho's interests were aligned with SL.  (Lindzon Cert., ¶ 12d).  But by the fall of 2013, Kensho began attracting interests from larger institutions and, at Kensho's request, SL helped Kensho attract larger investments, with Kensho eventually securing over $15 million in new investments.  (Lindzon Cert., ¶ 12e).

72.     In the fall of 2013, Nadler advised SL that General Catalyst Partners ("General Catalyst") wanted to commit a substantial investment in Kensho required that all existing note holders, including SL, convert their existing note purchase agreements and notes to General Catalyst standard form of note purchase agreement and note, which would purportedly treat all note holders the same way.

73.     Relying on Nadler's and Kensho's representations and promises, SL agreed to exchange its note on the understanding that all investors in Kensho would be signing the same form of note purchase agreement, that all would be issued the same form of note, and that SL would shortly be making an additional investment in Kensho as part of General Catalyst's larger investment round.

74.     In August 2014, however, Kensho refused to honor its agreement to allow SL to participate in General Catalyst's round of financing, and purportedly paid off and cancelled SL's replacement note in full instead of converting SL's note into equity, as it apparently did for all other Kensho investors.  Moreover, after Kensho obtained this new round of financing, it stopped communicating with SL altogether.  (Lindzon Cert., ¶ 12f).

75.     Pursuant to the terms of its note, SL filed claims against Kensho in AAA arbitration for improperly paying off SL's note without providing SL the equity it was promised.  That arbitration is currently pending.

### E.     The Emails At Issue

76.     In the Feld Email, Nadler wrote the following:.

> Howard Lindzon is that … a person who uses shell games and bait and switch tactics to **lure and exploit** the inexperience of first time entrepreneurs – a man who we came to discovery had **such a checkered past** that other entrepreneurs had actually sued him for **attempting to scam and manipulate them**, a man

who we came to discovery had never once disclosed to us … that he had been taken to court and *fined by regulators* in the past ***for the precise types of accounting improprieties that are designed to prevent Bernie Madoff-like scams, accounting rules designed to protect LPs from millions of dollars simply disappearing*** (which we also discovered later happened to Mr. Lindzon's limited partners *after* regulators had already fined Mr. Lindzon and ordered him to Cease and Desist his accounting violations).

(Butts Decl., Ex. XX) (Emphasis added).

77. In the Destin Email, Nadler also wrote the following:
- "Howard Lindzon … would be *toxic* to the company, and in fact to everyone around him;"

- "As you know, SEC laws state that at the time of buying or selling securities (such as a convertible note) you are required to disclose any 'material fact' … Can you imagine what kind of person fails to disclose to a company operating in the financial industry the astoundingly material fact that he has a record (attached) of being fined and ordered to cease and desist by securities regulators, over the precise types of accounting improprieties that are designed to prevent Bernie Madoff-like scams?"

- "Maybe it *was* his partner that stole millions of dollars of his LP's money. Maybe he had no role and knew nothing. We will never know for certain what Mr. Lindzon knew or did not know in relation to the disappearance of millions of dollars of his LP's funds. All we know for certain is that millions of dollars of his LP's funds simply disappeared, after he had already been fined and ordered to cease and desist by securities regulators for accounting and reporting improprieties."

- "This is just the tip of the iceberg. … But [Lindzon's] material non-disclosure was fraudulent, a further violation of SEC laws … and his checkered past with securities regulators, LPs with disappearing funds, other entrepreneurs who sued him for scamming them, and so on, falls into the age-old prudent category of 'I don't need to wait to discovery every lurid detail to know enough to stay away.'"

(Butts Decl., Ex. XX).

F. **Lindzon & Associates LLC**

78. Lindzon started Lindzon & Associates LLC, an investment advisory service firm, in 1998. (Lindzon Cert., ¶ 9). Lindzon & Associates was based in Phoenix, Arizona. (Butts Cert., Ex. Y-3, ¶ 1).

79.     Pursuant to the Arizona Securities Law, investment firms are required to have an independent certified public accountant verify all client funds and securities and file a verification form once a year. (Lindzon Cert., ¶ 9; AAC R14-6-2026(6)).

80.     During its operating history, Lindzon & Associates complied with this regulation, except that in 1999, Lindzon & Associates inadvertently missed its annual filing. (Lindzon Cert., ¶ 9; Butts Decl, Ex. Y-3).

81.     Once the error was disclosed, however, Lindzon & Associates filed its verification form, agreed not to miss the filing again, and paid a minor $2,500 fine. (Lindzon Cert., ¶ 9; Butts Decl, Ex. Y-5).

**H.     Empire Capital Group**

82.     In 2000, Lindzon became associated with Empire Capital Holdings Group, LLC, as Executive Vice President. (Lindzon Cert., ¶ 10). In that role, Lindzon had no oversight of the company's custodial accounts. (Lindzon Cert., ¶ 10). On the other hand, Scott Tominga, Empire's President and CEO, controlled the company's custodial accounts. (Lindzon Cert., ¶ 10). In [DATE], without Lindzon's knowledge or participation, Mr. Tominga stole approximately $7 million of Empire Capital's client funds. (Lindzon Cert., ¶ 10).

83.     Subsequent to the discovery of Mr. Tominga's fraud, Mr. Tominga (and only Mr. Tominga) was sanctioned by the NASD for misappropriating client funds. (Butts Decl., Ex. E-2). On the other hand, Lindzon had no involvement altogether in Mr. Tominga's fraud. In public comments addressing this unfortunate incident, Lindzon explained that:

- Mr. Tominga "was an auditor within the NASD before I met him so he knew the ins and outs … [and] [t]here was no reason not to trust him."
- Mr. Tominga "was waking up every day a liar and a thief and spending most of his time stealing and expertly covering it up with our first clearing firm … ."
- Lindzon "was very fortunate to have fraud insurance … and even luckier to get paid on it … ."

(Butts Decl., Ex. E-2-4).

84. Lindzon also explained that he "had to tell all my limited partners that I was a victim of fraud. … [he] got back 95 percent of my investors['] money but obviously lost the business." (Butts Decl., Ex. F-4).

### I. Disputes and Litigation With Others

#### 1. Charl.ly & Sykes

85. In 2011, Pallian Creative, a company with respect to which Mr. Sykes was a 50% owner, brought a claim against Stocktwits, which was essentially a straightforward breach of contract claim. (Lindzon Cert., ¶ 11b; Butts Cert. Ex. CC).

86. The suit was eventually settled with neither part admitting to any liability. (Lindzon Cert., ¶ 11b; Rice Cert. Ex. [X – Answer]; Rice Cert. Ex. [X – Stip of Dis]).

87. Mr. Sykes also brought a libel claim in 2012 against Lindzon, but this claim was voluntarily dismissed by Mr. Sykes prior to any discovery taken. (Lindzon Cert., ¶ 11c; Butts Cert. Ex. CC; Rice Cert. Ex. XX ([Stip]).

#### 2. Digital Whammy

88. Separately, in 2005, Digital Whammy filed suit against Longtail LLC, a company in which Lindzon had an ownership interest, and sought a declaration concerning Longtail's ownership of certain (i) intellectual property and trade secrets, (ii) corporate opportunities, and (iii) monies allegedly owing to Longtail. (Lindzon Cert., ¶ 11d; Butts Decl. Ex. GG).

89. Like many business disputes, this was simply a failed business venture where the parties were unable to agree on terms and litigation resulted. Eventually, the cases was settled [CONFIRM WITH HOWARD] without even proceeding to discovery. (Lindzon Cert., ¶XX).

#### 3. Sport Squeeze

90.     In 1997, Sport Squeeze filed a suit against Pro-Innovative Concepts and Lindzon, as an investor and member of the company in, and alleged that the defendants obtained certain patents fraudulently and "harassed, annoyed, persecuted, injury, destroyed, and otherwise interfered with the prosecution of plaintiff's business." (Mov. Br. at 16 citing Butts Decl. Ex. HH).

91.     The Court's final decree and judgment found that (i) Sport Squeeze, not Pro-Innovative or Lindzon, had infringed on defendants' patents, (ii) Sport Squeeze was enjoined from selling certain products that violated defendants' patents; (iii) plaintiff's claims were dismissed *with prejudice*; and (iv) defendants were entitled to damages from plaintiff for any future infringement. (Rice Cert., Ex. XX).

DATED: October 6, 2015

ATTORNEYS FOR PLAINTIFFS

By:/s/ Ashley D. Posner
ASHLEY D. POSNER
POSNER LAW GROUP
15303 VENTURA BOULEVARD #900
SHERMAN OAKS, CA 91403
Tel: (310) 475-5820
Fax: (310) 474-1901
ashleyposner@gmail.com

JAY J. RICE
BRADLE L. RICE (*pro hac vice pending*)
NAGEL RICE LLP
103 EISENHOWER PARKWAY
SUITE 103
ROSELAND, NJ 07068
Tel: (973) 618-0400
Fax: (973) 618-9194
jrice@nagelrice.com
brice@nagelrice.com

Attorneys for Plaintiffs Howard Lindzon, Social Leverage, LLC, Social Leverage Capital Fund I, LP, and Social Leverage Capital Fund II, LP